Mr. Marzullo, when you're ready. MR. MARZULLO v. United States I am indeed, Your Honor. Thank you, and it's nice to see Your Honors again. This case was dismissed by the trial court on three grounds, the navigation of servitude defense, the lack of a property right, and lack of jurisdiction based on the statute of limitations. I think we have dealt adequately in our brief with the first two, so I'll touch on those slightly, and then I think I'll take up, if I might, subject, of course, to the Court's questions, the more vexing issue that we've observed of late in a number of cases, being the statute of limitations. Very good. As to the navigation of servitude issue, there are two reasons why the navigation of servitude simply is not going to apply in this case. First is a very obvious one, and that is that both the C-44 canal and the S-80 structure from which the discharges of polluted water have been made into the St. Lucie River are artificial structures, and there is no navigation of servitude attaching to artificial structures. If there were, then the owners of the land that was taken to construct the canal, to construct the S-80 discharge structure, would not have received any just compensation. They would have been required to give over their land for that construction because of the navigation of servitude. The C-44 canal runs 23.9 miles from Lake Okeechobee to the St. Lucie River, and the S-80 structure is used solely for the purpose of discharging water from Lake Okeechobee into the St. Lucie. Those two water sources were not naturally connected at all in the S-80 structure itself. It is quite independent of the lock through which boats pass. The second reason why the navigation of servitude doesn't apply is simply that the discharges here are not for navigation purposes. Mr. Marzullo? Yes, Your Honor. Just a quick question regarding the navigation of servitude. Are you saying basically that the navigation of servitude only applies at natural water? Yes, Your Honor, to navigable waters that were navigable probably at the appropriate point in the commencement of this nation when the Declaration of Independence was issued. If the government today builds a waterway, and I think we've seen this with the cases involving the intercoastal waterway, the government does not possess the same navigation of servitude with respect to such a waterway. It doesn't create that navigation of servitude for the artificial waterway. Under your definition, then the Erie Canal and the Panama Canal would not be navigation? There would not be a navigation servitude attaching to them by reason of the Constitution, Your Honor. Yes, and that's because they simply didn't exist previously. That is my understanding of the navigation of servitude. Do you have a case for that? You know, I apologize. I was going to say, and I hesitate to say this to Your Honor, I thought that there was a discussion at that point in Bowling, and I do know that we addressed in our brief the fact that artificial waterways are treated differently from natural waterways. That is that the navigation servitude does not attach to, first of all, non-navigable waters, and secondly, to artificial waters. I'd be happy to supplement our brief, if the Court wishes, with authority on that point. I do believe that there are some authorities cited, possibly in either Bowling or in the other cases involving intercoastal waterways. Well, Bowling was not really a navigational issue. Bowling was an issue regarding the time in which the statute of limitations was applied. Yes, understood, Your Honor. But it was a case in which, and I think that's the point, that it was a case in which the defense did not arise precisely because it dealt with the construction of an artificial waterway. So the government had only the statute of limitations defense and not the artificial waterway defense. Mr. Marzullo, isn't the artificial structure part of an overall navigational waterway that is affected by the integrity of the levees around Lake Okeechobee? Well, the answer to that question is, of course, yes, Your Honor. However, the coastal petroleum case is not the controlling case here because the issue there was whether there was a taking of the limestone blocks which were literally used to construct the Herbert Hoover dike. And what the court found is that as long as the dike served navigation purposes, even in part, that the plaintiff couldn't allege that the limestone had been taken for a non-navigation purpose. Our point here is that all the water that is discharged into the St. Lucie from the SAA gates is discharged in the course of a water regulation program which primarily deals with holding water in Lake Okeechobee during the dry season so that it can be used to irrigate surrounding agricultural lands. It's actually pumped back into Lake Okeechobee, and then when the rainy season comes, all of a sudden the court says, now we need to get rid of a big slug of that water. And that's the source of the taking here. Well, I agree with you that there are other purposes here for this activity in controlling the flow from Lake Okeechobee or back into Lake Okeechobee, but one of those purposes certainly is the overall maintenance of the navigational waterway from the east coast of Florida to the west coast of Florida. And that is affected by the integrity of the levees. Well, it is in a generic sense, Your Honor. I certainly agree with that. But that is not the purpose of these discharges. That is, if that's what the government wanted to accomplish, if they were regulating the levels solely for the purpose of navigation, primarily for navigation, then those levels would be regulated in a far different way. The reason that large amounts of water have to be released when the rainy season comes is because they are held in Lake Okeechobee for agricultural irrigation purposes during the dry season. And that's what distinguishes this case from navigation, and I think brings it within the Palm Beach Isle analysis. The question is whether these releases are for navigation purposes or not. As to the riparian right, I think I can do a pretty quick one there. Both the Florida cases and the Supreme Court most recently in Stop the Beach Renourishment has held that the riparian right is a property right for which just compensation must be made. And I think the Florida court in the Belvedere development case made clear that the riparian right is part and parcel of the upland ownership and part and parcel of the value. Where I think the trial court went wrong and where the government goes wrong in its analysis is this, even conceding that what the government says is correct, and that is that what a riparian owner has is a right of reasonable access, a right of reasonable use, a right of reasonable view. If the river is in effect destroyed by the release of cyanobacteria that causes it to be toxic upon touch such that the health department prohibits people from even having access to the water or actually coming in contact with the water, let alone swimming and boating and fishing and so forth. But isn't that a police power of the state? Of course it is, Your Honor. It's an enforcement of its police power, isn't it? Yes, absolutely. Is that a public restriction all the way along the river, not just to the riparian right holders? Absolutely. What I am saying is that when you buy a house, Your Honor, on a pristine river like the St. Lucie, if that water body is destroyed either by blocking it up so there's no more water in it or by polluting it such that you can't have access to it, you can't touch it, you have dead fish floating in it, you have this brown foamy milkshake or Coca-Cola sort of appearance to it, you can't take your boat out, you can't float your dock, you have the death of the oyster beds, that in effect the riparian right has been destroyed every bit as much as if a fence were put up around that river and the riparian owners were told that they couldn't go into the river. It goes to access. You've ticked off a number of different conditions, all of which if you put them all together I suppose you can make an argument that that constitutes the taking away of the river in a realistic sense. But setting aside whether all those conditions are determined to have been present in this case, what particular component, what component of all of those features do you think falls within the riparian right under Florida law? Well, for example, surely something that happened that destroyed oyster beds and did nothing else wouldn't be a violation of the riparian rights of the landowners adjacent to the river, would it?  I agree with you, Your Honor. Do you need something which constitutes converting this from a river into effectively let's say a sewer in order for the riparian right to be infringed? You have to get to the point that the reasonable rights of access, reasonable rights of view, rights of reasonable use and enjoyment of the water have been substantially interfered with, Your Honor. And whatever that dividing line may be, I think our point is that dividing line was certainly crossed in this case and was crossed for the first time in the period 2003 to 2005. So what I was going to was the question of whether there's a property right at all. The government has suggested, well, I know it says right to be free from pollution, but surely one drop of pollution in the river isn't a violation of riparian right. I agree with that. What I'm saying is the right to be free from pollution is in effect a way of defining the right of access, the right of view, the right of reasonable use of a river that is not so polluted that it is in effect a cesspool and far from an amenity, it's whatever the opposite of amenity is. You're defining the riparian right under Florida law based on the four items listed in the Walton case and then very past the 1909 case, they have been a more detailed explanation, but the test really comes down to and should be viewed by us as the test articulated in Walton.  Although ultimately I suspect that the Florida Supreme Court is the one that we should reference. And there's not only very past, but there is the subsequent decision in Harrell, Harrell against Hess Oil and Chemical, prohibiting the dumping of gravel and sand as a violation of the riparian right. And there are the access cases which talk about just allowing access, suppose, I believe it's the... But Walton is the most recent, the most recent Supreme Court pronouncement. Yeah, from Florida Supreme Court. That is correct, Your Honor, and of course Stop the Beach Renourishment is from the United States Supreme Court. Mr. Marzullo, you are running into your rebuttal time. Did you want to turn to the limitations? Yes, Your Honor, I will do that briefly. All right. The controlling case is Northwest Louisiana Fish and Game. That case holds that it is not the foreseeability that is the test, but rather it's the question of when does the permanent damage occur? The difficulty being that one cannot bring a suit for a physical taking prior to the date on which that physical taking has actually occurred. The trial court and I think the government missed that point, missed the fact that although there had been times at which damage had been done to the St. Lucie over the years, obviously that damage had only been temporary and the river had healed itself. That's why, as of 1998, this was still the most biodiverse estuary in the United States. The damage, although it had been temporary, had not amounted to a permanent taking until the fatal period of 2003 through 2005 when hundreds of billions of gallons of highly polluted water, water from Okeechobee, which had now become far, far more polluted than it had been previously, wiped out the life in the oyster beds and caused not only that but all of the other things that I've described, the bacteria and the fish and the rest. That plus the fact that the Corps of Engineers from 1952 when they said they would only make such releases in emergency cases through 1958 when they first said, well, we'll send the water south to the Everglades, which is where it had naturally run, through the 70s and the 80s when they came up with 10-year plans and other kinds of proposals to solve this problem up to the present day where they're still looking at it, still saying they're trying to solve it. That's why the Statute of Limitations has not run. Mr. Marzullo, if I'm an oyster fisherman and not a property owner and I sue the government for the taking of the oyster bed that is my living, when would that action arise? When the government first commenced the releases from Okeechobee or after that? When the result of the oyster beds are known to be polluted? Substantial and permanent destruction occurring to the oyster beds, Your Honor. Prior to that time, your lawsuit would say, I am afraid that the oyster beds are going to be destroyed if you keep doing what you're doing. And the response would be, that lawsuit is premature. That's what the Supreme Court talked about in Dickinson. The lawsuit for the taking of the oyster bed can only be brought at the point where the damage has actually occurred, and that's particularly true where it is wholly within the government's power to cause or not cause that taking. If there were to be, I don't know if there's anything in the record that gives us any enlightenment on this, but help me if there is. If there were to be a cessation of the release cycles as of today, how long would it be, if there's any indication, before the river returned to some degree of viability? I think you're right, Your Honor. We don't know that. It's not in the record. It is my understanding that the damage at this point appears to be permanent and absent some human intervention. Well, human intervention in the form of simply stopping the releases of water from Okeechobee or human intervention in a more, what is the word, proactive form? I think in a more proactive way, I think, Your Honor. I think that's what it's going to take now to bring the St. Lucie back. But there's nothing in the record that would lead to Okeechobee. There is nothing. Okay. Why don't we hear from the government now? We'll restore a couple of minutes of rebuttal. Thank you, Your Honor. We've asked you a lot of questions. Ms. Barton. Welcome back. Thank you. May it please the Court. Our view, of course, is that the trial court correctly rejected the plaintiff's taking claims on all three grounds, that they're outside of the statute of limitations, barred by the navigational servitude, and that they have not established that they have a property right in the interest that they allege to have been harmed by the government's releases. And since the statute of limitations is jurisdictional, I will start there. Now, the government, as you know from our brief, disagrees that this is a case where the stabilization doctrine applies because it isn't a case of a continuous, gradual, physical process. But really, in our view, it doesn't matter because either way, we think the claims accrued no later than in the 1950s. And the trial court, in fact, found that the claims that the plaintiffs have here closely mirror the damages that were caused by the project in the 1950s. And that is a jurisdictional finding, in fact, that's subject to clearly erroneous review. And we think that is correct. And I think the best place we cite several places in our brief, but the best place to see what was happening in the 50s and how similar it was to what's happening today, is in the Coors 1956 report, which actually was looking at whether to do some mitigation, but looked at the damages. And we cite it in our brief. It's in our supplemental appendix at page 239. But I'd like to just address it in a little more detail with you. It says in discussing the damages in the area, local interests have contended for many years, this is 1956, that the release of lake regulation discharges through the St. Lucie Canal causes serious damage to fishing and boating in the St. Lucie estuary. The principal complaints are that the turbid freshwater discharges replace the brackish water in the river, cause many fish to leave the area, that marine life unable to leave is killed by the freshwater, and that sediment is deposited in the estuary. For some time, local interests have been very bitter and critical concerning the releases and their effects in this area. It goes on to say how they've formed a group, Restoration League, with an estimated membership of 1,250. The primary objectives of the League are discontinuance of lake releases through St. Lucie Canal and restoration of St. Lucie River to its former condition. The district engineer has received protests from the League following practically all discharges. This happens every time there are large discharges. But as I understand Mr. Mazula's argument, he's saying, well, perhaps that's true, that people have complained for a long time, but the river didn't, the river wasn't dead until 2003, 2005, that it was this last go-around that resulted in the end of the viable St. Lucie River as we used to know. You know, I think, this is part of what I'm trying to establish, is every time there are releases, this happens. Every time there are large releases, it happens seriously. It's the brackish, mostly what the problem is, is the brackish, there's this freshwater returning, turning the brackish water into zero salinity, which causes all kinds of problems, plus sedimentation coming down. The standard, at least under the stabilization doctrine, which would seemingly apply regardless of what we're using, is that the damage, all the damage doesn't have to have occurred. It just has to be clear that there is, that there's some permanent nature to the government, the effect of the government action, and that the damage is reasonably foreseeable. Now, in this... Does the government action have to be continuous in order for there to be damage, or can it be sporadic? Let's say it happens every two years instead of every year. Does that make a difference? I... I mean, the cumulative effect is the same, isn't it? Whether it's sporadic or whether it's continuous. Well, here, the effect isn't really cumulative. What happens is, there are releases, and there have been releases much larger, actually, in concentrated periods than what happened in 2003 to 2005. Your view is that it's episodic. And it's episodic, right. And you can see, in 1970, there's a Wall Street Journal article that used the St. Lucie as the premier horrible project that the Corps had developed, saying that St. Lucie is dead, you know, and the birds are gone. I mean, every time... And there was a huge release in 69. Every time there were these really large releases, there has been an outcry that the St. Lucie is dead. And this... As I was saying, here, the Corps in 56 is saying this. Every time, you know, they have these releases, these people complain, they can't... You know, the wildlife is dead. Plus, turning to... There actually isn't anything, really, in the record that shows that the harm is permanent this time. Even most of the statements that they have, like in the reply brief, will say, restoration will have to start, you know, we'll have to bring the oyster beds back. I mean, this is... Is there anything in the record... I asked you the same question I asked Mr. Marzullo. Anything in the record that suggests a period of time, either assuming no further outflow from the lake or mitigation efforts within the realm of the possible, within which the river could return to its prior state? I mean... Well, go ahead. I think not. I mean, some of the effects are diminished more quickly than others, but not in this particular... If this is really different, that part of the record... I mean, this is something that has troubled me about this category of cases for a while, which is that even the flooding cases, assuming it's not flooding to make a TVA reservoir or something, or a permanent, more or less permanent lake, but conditions can abate over time. And it's unclear to me what degree of comprehensive destruction is necessary, even if that comprehensive destruction is subject to recovery over an extended period of time. What degree of destruction is necessary in order to constitute a taking? I mean, we know that if it's simply destroyed for one season and it comes back the next season, we wouldn't say that that's a taking, or at least I would assume not. Maybe it would be a temporary taking, but it's certainly not a permanent appropriation. Well, I mean, our view is that the stabilization doctrine applies only in cases of continuous physical processes and doesn't apply here, but you still have the question, I guess, of the permanent nature of the taking, and it's a factual question that actually the trial court resolved and said it happened no later than the 1950s, because as of the 1950s, we have this evidence that it's just repeated. It happens all the time. Except that in the 1950s, we know that the river recovered, so it wasn't permanent. I mean, one could almost argue, was there even a temporary... I mean, is there... Well, we could say this isn't a taking claim at all, right? So it's a little difficult to talk about, but yes, I mean, to the extent that running fresh water, water from... Fresh water is a pollutant for the St. Lucie estuary. Into the St. Lucie, it's going to happen. Once actually Florida built the project, the Corps just took it over after almost 3,000 people were killed because of the way the project had been built, but once that water keeps running down, it has the same effect all the time. Now, it is true that the water has become more polluted, and maybe it's added some swimming. Now you can't swim, which is one... There are a few minor changes, but that is not a sufficient enough change to say, well, the claims that these people in the 50s would have said they had weren't enough. They had to wait until they couldn't swim. I mean, that clearly can't be the standard. You'd have to be saying that these claims weren't right. And actually, I wanted to actually go on and use this report to point out that in this very report, they look at mitigation actions, and the Corps says, we're not going to do them. This is like the Northwest Louisiana Fish and Game case where they said, any uncertainty you had was terminated when the Corps said, we're not going to fix your problem. And actually, in this report, they say that people want us to stop making the releases, and they don't even consider doing that, but they do say, we'll try to address the sedimentation, and they say, we're not going to. They held us harmless, and we're not going to. So you're saying that whenever the government decides not to mitigate the problem, that's when the cause of action is? No, but I'm saying one of their arguments is that the mitigation delayed accrual, and I'm saying mitigation promises delayed accrual, and I'm saying as early as the 1950s, when these problems, you know, they sent a telegram to President Eisenhower saying they had $3 million worth of, I mean, yes, Eisenhower, $3 million worth of damage. I mean, these people were seriously felt that they had harm, and the Corps recognized it, that it had been repeated, it had been happening for years, and wasn't going to do anything about it. There's no, it seems to me that certainly any claim by then, as the trial court found, had accrued and was not delayed by any promises of mitigation. What are your views on the riparian rights question? The, well, there's no Florida case that says that if a river becomes sufficiently ugly or unhealthful that the riparian owners have a greater right than the public, a different right than the public to have that river be clean. I mean, the Florida law draws a distinction between the rights that are shared with the public and the rights that are a special injury to the riparian owners. And there, I mean, the burden is on the plaintiffs to establish the existence of a property interest. Mr. Marzullo may have theories about there being some kind of special injury if a river, you know, some, is blocked off or something, but, I mean, there isn't any law to support that, right? The only law they rely on is Ferry Pass. As I understand his argument, he referred to Walton and, in particular, the right to reasonably use the water. That's the second factor in the Walton four-factor list. And says that when you can't even touch the water, you can't get in the water, in effect, your right to reasonably use the water has been taken, and that's a riparian right. That's not a special right for the adjacent property owner. The reasonable use of water, as stated in Ferry Pass, is for domestic purposes. It's a use. The special rights that the riparian owners have in the use of the water are what is necessary. As Ferry Pass talks about this, and Ferry Pass actually draws a distinction, they are the rights that you need in order to make the use of your property. So if you, at a time when people needed the water, that's where they got their water for living there. They had a right to be able to use that water. If they had a business, like there are some mill owners, these aren't even property rights cases, though, they're tort cases, but there was an idea that you had a business that depended on the water. You had a right to have the water for that business. What do you make of Ferry Pass' reference to pollution? I think it is related to the use, the next phrase, which is the right to use water for domestic purposes in Ferry Pass, in that long passage right after it says the right to pollution-free water, and this is the right to use for domestic purposes. You know, Ferry Pass actually drew a distinction. Ferry Pass said, which wasn't a takings case, but said, we will protect you, we will enjoin the use of your shoreline by another party that's preventing you from using your shoreline or from getting to your property. But once you get on the water, if they block your navigation, even for your business, a shipping timber business, once you get on the water, that's a police matter. That's up to the police. We're not going to enjoin them from blocking you from navigating away from your property. So the special rights that the riparian owners have are related to the use of that upland property. And there aren't any cases, I mean, there's one case where somebody living on an island couldn't have any reasonable way to get to their property but for the water, and the court said, okay, you have a right there that other people don't have to cross the water using motorboats, because there was all kinds of, that you had to use airboats to get over the vegetation. But if there was another, subsequent cases held if you had a road to your property, you didn't have a right to get to your property across the water. So it's very, when it gets to the rights that are shared with the public, there isn't any Florida law for the propositions that Mr. Marzullo suggests. If there's any, I think the navigational servitude, that part is just governed by this court's case of coastal petroleum, which dealt with the same project. But if anybody, if you have any questions on that, I'd be happy to address them. Otherwise, sit down. Very good. Thank you, Ms. Martin. Thank you. Mr. Marzullo, a couple of minutes for Bob. Yes, thank you, Your Honor. I think the court has identified the key issue here on the statute of limitations, and that is the nature of the damage. And I think this case is very clearly controlled by the decision in Northwest Louisiana Fish and Game, which was very similar. Over a period from 1988 up until 1996, the owners of the Black Lake kept saying to the Corps of Engineers, if you don't let us drain this pond, we're going to end up with a huge weed problem. And the Corps said, yeah, we're looking at that, we'll think about it, and so forth and so on. In 1994, the weeds started to grow. That's outside the statute of limitations. But not until 1996 had they grown to such a point that they were a permanent infestation in the lake. That was the holding of this court. And I think that that definitely controls here. As to the riparian right, quite frankly, if there's any question on that issue, the court may wish to consider certification. I know we're back to that issue again. It's a little odd that the government says ignore Ferry Pass where it says we can't pollute the St. Lucie to the point that it is fundamentally a running sewer, but look at Ferry Pass where it says reasonable use only means domestic use. Well, even with that narrow definition, Your Honor, it seems to me that the owners here cannot make any reasonable use, any domestic use, reasonable use and enjoyment of the water if it is so polluted. And finally, I was surprised the government didn't respond to Palm Beach Isle, which I think controls on the issue of navigation servitude. It says the discharges have to be for a navigation reason. And to say we built a 23.9 mile long canal so that we could discharge this highly polluted water into the St. Lucie River to protect the Herbert Hoover Dyke, which was built primarily, of course, following a huge flood to avoid the loss of life at that occasion, to connect that up with navigation is a very, very long chain and I don't think that it qualifies under Palm Beach Isle. Very well, Your Honor. Thank you, Mr. Marzullo, Ms. Barton. Case is submitted. Thank you, Your Honor.